UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NORTHBOUND GROUP, INC.,          )
                                 )
          Plaintiff,             )          Case No. 11 C 6131
                                 )
v.                               )          Magistrate Judge Sidney I. Schenkier
                                 )
NORVAX, INC., LEADBOT, LLC,      )
CLINT JONES and MICHAEL AHERN,   )
                                 )
          Defendants.            )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Northbound Group, Inc. ("Northbound" or "plaintiff"), has filed a five-count amended complaint against Norvax, Inc. and its CEO, Clint Jones, and Leadbot, LLC, and its CEO, Michael Ahern (collectively, "defendants"), asserting claims of fraud, promissory estoppel, breach of contract, breach of fiduciary duty, and conversion (doc. # 4: Am. Compl.). Presently before the Court is defendants' motion to dismiss Northbound's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] For the reasons set forth below, defendants' motion to dismiss is granted in part and denied in part.

---

[1] On December 7, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(b), this case was assigned to this Court for all proceedings, including the entry of final judgment (docs. # 31).

[2] Five days after Northbound filed its response to defendants' motion to dismiss (doc. #34), it filed an "amended" response (doc. #36), without leave of court and without explanation for the amendment. Since the amended response was filed two weeks before defendants' reply was due (and defendants requested, and were granted, an extension of time to file their reply (doc. # 42)), defendants were not prejudiced by the amendment. Furthermore, defendants do not contest plaintiff's filing of the amended response. Thus, we grant Northbound leave to file the amended response *sua sponte*. The amended response will supercede the original response, and all references to Northbound's response herein will be to the amended response (doc. # 36). We admonish plaintiff, however, to seek leave of court before filing amendments to its pleadings in the future; failure to do so will result in pleadings being summarily stricken.

## I.

We begin with the allegations in the complaint, which we accept as true for purposes of the motion. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Because the complaint attaches as an exhibit the asset purchase agreement ("APA") between plaintiff and defendant Leadbot, we consider the APA as part of the pleadings for purposes of the motion to dismiss. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009) (holding that it was within district court's discretion to consider, on motion to dismiss, documents to which complaint referred that were concededly authentic and central to the plaintiff's claim).

## A.

This lawsuit stems from the APA entered into between defendant Leadbot and Northbound on February 27, 2009. In 1998, Benjamin Wagner and Rob McAleer founded Leadbot, a company that sold information about potential customers for life insurance (*i.e.*, "leads") (Compl., ¶¶ 8-10). Leadbot developed some of its own leads and acquired other leads through purchase from companies such as Norvax, a health insurance sales and online marketing technology provider (*Id.*, ¶ 11). At some point, Messrs. Wagner and McAleer incorporated Northbound and became co-owners of that company (doc. # 18: Defs.' Mem. at 1). The complaint does not disclose the date of the creation of Northbound, or its relationship to the Leadbot entity that Messrs. Wagner and McAleer founded in 1998.

Plaintiff alleges that under the APA, Northbound sold "substantially all" of its Leadbot assets to defendant Leadbot, a limited liability company, and Leadbot became one of Norvax's brands (Compl., ¶¶ 5, 13, 16). Mr. Jones signed the APA on behalf of Leadbot, LLC, as its Chief Executive Officer (APA, at 26-27). The complaint alleges that Norvax made the acquisition, and became the

2

sole member of Leadbot, LLC (Compl., ¶¶ 13-14). Defendant Ahern is the Chief Financial Officer of Norvax (*Id.*, ¶ 6-7).

The stated intent of the APA was for Northbound to sell, and defendant Leadbot to purchase, "all of the assets, intellectual properties, and rights of Northbound" (APA, at 1). This included all property, rights, and other assets connected to or associated with the Northbound business which "expressly includes, but may not be limited to: all owned computers and software located therein, Intellectual Property, all electronic data contained on the servers and computers, . . . , all intellectual property rights possessed by Northbound, all internet domains, websites, software applications, . . . , unless specifically excluded in this Agreement" (*Id.*, at ¶ 1(A)). The APA defines "Intellectual Property" as "all intellectual and industrial property . . . including but not limited to": "Software, Databases and fixations thereof;" "Proprietary Information;" "uniform resource locators, web-site addresses, domain names, web-site content and all fixations thereof;" and "any other intangible property similar to any of the above" (*Id.*, at ¶¶ 1(F)(III-VI)). Software, Databases, and Proprietary Information are likewise defined terms in the APA (*Id.*, at ¶¶ 1(D), (Q), (T)).

In consideration of the acquisition of Northbound's assets, defendant Leadbot agreed to pay Northbound a purchase price calculated based on a formula specified in Exhibit A to the APA (APA: Ex. A). Exhibit A to the APA states that the "Purchase Price will be paid through an earn-out" based on the earnings before interest, tax, and amortization ("EBITA") achieved by defendant Leadbot during three one-year periods: (1) 40 percent of Leadbot EBITA from March 1, 2009, to March 31, 2010; (2) 25 percent of Leadbot EBITA from April 1, 2010, to March 31, 2011; and (3) 20 percent of Leadbot EBITA from April 1, 2011, to March 31, 2012 (*Id.*). Plaintiff alleges that also attached to the APA were projections of Leadbot's earnings based on life insurance leads sold over the earn-

3

out period (Compl., ¶ 27). Based on these projections, Northbound would earn $2 million from life insurance leads, and more than $3 million including earnings from health insurance leads (*Id.*, ¶¶ 28-31). During the first three months after the sale, defendant Leadbot agreed to pay Northbound an advance of $10,000 per month, which was to be repaid over the six month period thereafter at a rate of $5,000 per month (APA: Ex. A).

The APA included identical consulting agreements for Messrs. Wagner and McAleer with the newly formed Leadbot, LLC (APA, at ¶ 2(E); APA: Exs. B-C).[3] The consulting agreements make all inventions, discoveries, developments, and innovations conceived by Messrs. Wagner and McAleer during the term of, and related to, the consulting agreements the exclusive property of Leadbot, LLC (APA: Ex. B, at ¶ 3; Ex. C, at ¶ 3). All inventions, discoveries, developments, and innovations they may have conceived of prior to the term of the agreement, and which they utilized in rendering their duties to Leadbot, LLC, remained the property of Messrs. Wagner and McAleer but were licensed to Leadbot, LLC, for use in its operations "for an infinite duration" (*Id.*).

Attached to each consulting agreement was a Schedule A, setting forth the "duties, term, and compensation" of Messrs. Wagner and McAleer (APA: Exs. B and C, Schedule A). Under the consulting agreements, they were required to "manag[e] lead generation, marketing, selling and distribution business," and to "fulfill any other duties reasonably requested by the Company [Leadbot, LLC] and agreed to by the Contractor [Messrs. Wagner and McAleer]" (*Id.*). Messrs.

---

[3]The consulting agreements were attached to Northbound's original complaint as Exhibits B and C to the APA (doc. # 1), but are not attached to the amended complaint. These exhibits to the APA are, however, specifically referred to in the APA (APA, at ¶ 2(D)), which we consider part of the pleadings for purposes of defendants' motion to dismiss. We therefore consider Exhibits B and C on this motion to dismiss. *Hecker*, 556 F.3d at 582.

Wagner and McAleer each were to receive $5,000 per month "[a]s full compensation for the services rendered pursuant to this agreement" (*Id.*).

Each consulting agreement contained a termination provision, which allowed either party to terminate the consulting agreement at any time with 60 days' written notice, and which further allowed Leadbot, LLC, to terminate the agreement immediately and without prior written notice upon a material breach of the agreement (APA: Exs. B and C, at ¶ 9). The consulting agreements state that they constitute the entire agreement together with attached exhibits, and all earlier agreements, understandings, and representations were terminated (*Id.*, at ¶ 18). Further, no modification of the agreement would be valid unless in writing and signed by the parties (*Id.*, at ¶ 17). The body of the APA does not contain either of these provisions (Compl. ¶ 22; APA).

## B.

Under the structure of the APA and the consulting agreements, Messrs. Wagner and McAleer had significant responsibility for generating the business of defendant Leadbot, which in turn was the mechanism for plaintiff to achieve the earn-out that would result in payment of the purchase price. Plaintiff claims that soon after the APA and the attached consulting agreements were signed, defendants prevented Messrs. Wagner and McAleer from fulfilling their duties under the APA. Northbound alleges that defendants promised they would make Leadbot an integral part of Norvax, and provide leads to Leadbot customers using a "bid platform" that awarded leads to the highest bidder (Compl., ¶¶ 18-20). In particular, plaintiff alleges that Mr. Jones said Norvax could supply approximately 500 to 1000 leads each day for Leadbot customers, and further promised that Norvax would provide substantial marketing support to the Leadbot brand, would open a call center in Tempe, Arizona, and would make Leadbot the "Life Division" of Norvax (*Id.*, ¶¶ 21, 23-25).

According to Northbound, after the parties signed the APA, the leads Norvax provided to Leadbot customers were nonexistent or of extremely low quality (Compl., ¶¶ 33-34). Northbound further alleges that in February 2010, Norvax placed low limits on the number of leads that could be awarded to Leadbot bids (*Id.*, ¶¶ 37-38). Then, on April 7, 2010, Norvax implemented a new policy that: (1) limited Leadbot to 20 percent of the available leads if the customer submitting the bid was also a customer of Norvax's competing brand ProspectZone; and (2) limited Leadbot to a maximum of 80 percent of the available leads to customers that were Leadbot's exclusive customers (*Id.*, ¶¶ 12, 40). That year, Northbound also discovered that in the event of two equal customer bids, the bid platform awarded the lead to the older customer, while all of Leadbot's customers were coded as new customers (*Id.*, ¶¶ 42-45). Bids as low as $1.75 submitted by customers of Norvax's other brands were favored over bids as high as $5.51 submitted by Leadbot customers (*Id.*, ¶ 45). Eventually, Norvax prevented the bid platform from awarding any leads to Leadbot bids (*Id.*, ¶ 37).

Northbound alleges that these actions by Norvax caused Leadbot, LLC, to lose sales (Compl., ¶¶ 33-34). This loss of sales decreased Northbound's earnings under the APA, as the purchase price was calculated under a formula based on sales of leads to Leadbot customers (*Id.*, ¶ 49). Furthermore, Northbound alleges that in January 2011, Norvax unilaterally doubled the cost of goods sold attributed to Leadbot's balance sheet, thus decreasing the EBITA and consequently the earn-out under the APA (*Id.*, ¶ 51). Compounding this problem, Northbound contends that defendants did not provide it with sufficient financial data to calculate Leadbot's EBITA (*Id.*, ¶ 50). Finally, in February 2011, Norvax stopped crediting Leadbot with sales to Leadbot online customers (*Id.*, ¶ 52). At the time the complaint was filed in September 2011 (two and one-half years into the three-year

earn-out period), Northbound had received approximately $225,000 based on the earn-out formula set out in Exhibit A of the APA (*Id.*, ¶ 32).[4]

## II.

Plaintiff has sued defendants on five grounds: common law fraud, promissory estoppel, breach of the APA, breach of fiduciary duty, and conversion. Defendants contend that each of these claims should be dismissed for failure to state a claim. The parties agree that Illinois law applies.

To determine if Northbound's allegations are sufficient to state a claim, we must determine if they both give the defendants notice of the claims to which they must respond and make the asserted claims "plausible on [their] face." *Ashcroft v. Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Barnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011) (citing *Iqbal*, 129 S. Ct. at 1949).

## A.

In Count I, plaintiff claims that defendants committed common law fraud by knowingly and falsely representing to plaintiff that: (1) the bid platform did not discriminate among bids and awarded leads to the highest bidder; (2) Norvax would make Leadbot the "Life Division" of Norvax; (3) Norvax would open a call center in Tempe, Arizona; (4) Norvax would provide substantial marketing support to the Leadbot brand; and (5) Norvax would provide Northbound with sufficient financial data to support calculation of Leadbot's EBITA (Compl., ¶¶ 55-59). Plaintiff contends that Norvax intended for Northbound to rely upon the alleged misrepresentations in deciding to enter into

---

[4]In their memorandum supporting dismissal, defendants state that Leadbot, LLC, terminated the consulting agreements in July 2011 (Defs.' Mem. at 6). Defendants do not disclose why this is relevant to the motion, or why the Court should consider this matter which is not part of the complaint. We therefore disregard this assertion.

the APA, and that Northbound justifiably relied on those statements without knowing of their alleged falsity (*Id.*, ¶¶ 62-64).

**1.**

Defendants initially argue that the fraud claim cannot proceed against Norvax or Messrs. Jones and Ahern, because they were not signatories to the APA (Defs.' Mem. at 2). That argument is a non-starter. A claim for common law fraud in Illinois requires a plaintiff to plead: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). Defendants cite no case, and we are aware of none, that holds that only the signatories to a contract may be liable for fraudulent misrepresentation for having induced a person to enter into that contract.

Furthermore, defendants contend that the Illinois Limited Liability Company Act, the Illinois Business Corporation Act, and Illinois common law shield defendants Ahern and Jones from liability for fraud because as corporate officers, they are not personally liable for "the debts, obligations, and liabilities" of Norvax and/or Leadbot, LLC (Defs.' Mem. at 6-7). Defendants argue that plaintiff's allegations must support a veil-piercing or alter ego theory to sustain a claim of fraud against them (*Id.*).

In addressing a case raising similar issues, another judge in this district aptly explained the error in defendants' argument as follows:

> plaintiffs seek to hold [the individual defendant] liable not derivatively, but directly, because he made the alleged misrepresentation. Veil-piercing and alter ego theories are a means of holding a principal of a company derivatively liable for the debts of

a company, thereby disregarding the corporate form. However, the general rule against imputing a corporation's liabilities to its principals has no bearing on whether a principal is directly liable for torts that he commits within the scope of his agency relationship with the corporation.

*Triad Capital Mgmt., LLC, v. Private Equity Capital Corp.*, No. 07 C 3641, 2010 WL 3023409, at

*11 (N.D. Ill. July 29, 2010) (holding that defendant corporate officer could not avoid liability for

fraud based on misrepresentations that he made as an officer of defendant corporation by alleging

that he made the misrepresentations on behalf of the corporation). "Although corporate officers are

generally not liable for the corporation's torts, a corporate officer is individually liable for fraudulent

acts of his own or those of the corporation in which he participates." *Express Valet, Inc. v. City of*

*Chicago*, 869 N.E.2d 964, 976 (Ill. App. Ct. 2007) (citing *Nat'l Acceptance Co. v. Pintura Corp.*,

418 N.E.2d 1114, 1117 (Ill. App. Ct. 1981)); *see also Buckler v. O'Brien*, 677 N.E.2d 1363, 1367

(Ill. App. Ct. 1997) (noting that "it is well recognized under agency law that an officer-agent of a

corporate principal is liable for his own tortious acts, and also may be liable for torts of the

corporation in which the officers have personally participated").

Here, plaintiff alleges that Messrs. Jones and Ahern made one or more deliberate material

misrepresentations intended to induce plaintiff to sign the APA. Although Count I alleges that

Norvax, not the corporate officers, made the alleged misrepresentations (*Id.*, ¶¶ 55-66), a fair reading

of the complaint gives notice that plaintiff seeks to hold not only Norvax responsible for the alleged

fraud, but also Messrs. Jones and Ahern.

**2.**

Defendants next argue that Northbound's claim for fraud should be dismissed in its entirety

because the claim attempts to assert "promissory fraud," which is not a recognized cause of action

in Illinois (Defs.' Mem. at 2). Under Illinois law, "a promise to perform an act in the future made by one who intends not to perform is not actionable fraud," unless "the false promise of future performance is part of a scheme or device to defraud another of [his or] her property." *Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*, 826 N.E.2d 970, 977 (Ill. App. Ct. 2005). Thus, we first consider whether any one of the alleged fraudulent statements cited by plaintiff were statements of present fact as opposed to promises of future performance.

Plaintiff alleges five specific misrepresentations that form the basis of its fraud claim (Compl., ¶¶ 55-59). Plainly, one of these alleged statements pleads a claim of misrepresentation of present fact, and properly pleads all of the other elements of common law fraud. Plaintiff alleges that before it entered into the APA, and in order to induce Northbound to sign, Messrs. Jones and Ahern "repeatedly represented" that the bid platform "*did not* discriminate among bids and awarded leads to the highest bidder" (Compl., ¶ 20 (emphasis added)). Plaintiff claims that, contrary to this representation, the bid platform actually discriminated against Leadbot's bids, thereby decreasing the earn-out plaintiff received under the APA (*Id.*, ¶¶ 35-39). Plaintiff also alleges that Norvax knew these statements about the bid platform were false when made (*Id.*, ¶¶ 60-61), and that Northbound relied on these statements in deciding to enter into the APA. These allegations satisfy the notice and plausibility prongs of *Iqbal*, and sufficiently plead a claim under Illinois law for common law fraud. *See Connick*, 675 N.E.2d at 591.

As a result, the fraud claim survives dismissal. However, it survives dismissal only as narrowed in two ways.

*First*, none of the other alleged misrepresentations state a claim for common law fraud. According to plaintiff's own allegations, three of the alleged misrepresentations occurred only *after*

the effective date of the APA on February 27, 2009: the promise to make Leadbot a life division and to provide substantial marketing support are both alleged to have occurred in April 2009 (Compl., ¶¶ 23-24), and the promise to establish a call center allegedly occurred in May 2009 (*Id.*, ¶ 25). Plaintiff has not explained how alleged post-contractual promises could influence the prior decision to enter into a contract. We therefore dismiss the fraud claim insofar as it is based on these allegations.

The only other alleged misrepresentation identified in Count I is the alleged promise to provide sufficient information to support the calculation of the EBITA (Compl., ¶ 59). However, the complaint nowhere else alleges such a representation, when it occurred, or who made it. This alleged basis for the fraud claim fails the notice requirement of *Iqbal*, and we therefore dismiss the fraud claim insofar as it is based on that allegation.[5]

*Second*, plaintiff's fraud claim does not state a claim against defendant Leadbot. Federal Rule of Civil Procedure 9(b) requires a party to "state with particularity the circumstances constituting fraud . . ." Fed. R. Civ. P. 9(b). Neither the allegations in the background section of the complaint, nor the allegations in Count I, identify Leadbot, LLC, as having made any of the alleged fraudulent misrepresentations. The alleged misrepresentations we find sufficient to state a fraud claim allegedly were made by Messrs. Jones and Ahern, who were officers of Norvax (Compl., ¶¶ 6-7, 20), and the fraud count attributes these alleged misrepresentations to Norvax (*Id.*, ¶ 55). The

---

[5]In its background allegations, plaintiff also alleges that in September 2008 (prior to the signing of the APA), Mr. Jones represented that Norvax *could* supply 500 to 1000 leads per day for Leadbot customers (Compl., ¶ 21) (emphasis added). We need not now decide whether a statement about what Norvax "could" do was a statement of present capability or a promise of future performance, because in Count I plaintiff does not identify that alleged statement as a basis for its common law fraud claim (*Id.*, ¶¶ 55-59).

11

complaint does not allege any role by Leadbot LLC in committing this alleged fraud. Thus, the fraud count cannot be maintained against defendant Leadbot.[6]

Accordingly, we deny the motion to dismiss the fraud claim in Count I. However, we narrow that claim to fraudulent inducement by defendants Mr. Jones, Mr. Ahern, and Norvax (and not Leadbot LLC), based on the alleged statements concerning the bid platform.

**B.**

In Count II, plaintiff contends that the same misrepresentations or false promises forming the basis of its fraud claim also support a claim for promissory estoppel against defendants (*see* Compl., ¶¶ 68-71). Defendants seek to dismiss this claim, arguing that promissory estoppel is not a recognized cause of action in Illinois (Defs.' Mem. at 11-12). However, the Illinois Supreme Court recently – and squarely – has held otherwise: "Illinois law provides for an affirmative cause of action under the doctrine of promissory estoppel." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 528 (Ill. 2009). Recognizing this in their reply, defendants shift their argument to assert that plaintiff has failed to state a claim for promissory estoppel (Defs.' Reply at 8).

We agree. Under *Newton*, the cause of action for promissory estoppel is a limited one. A plaintiff may recover under the theory of promissory estoppel only in the absence of a contract between the parties. *Newton*, 906 N.E.2d at 528. In this case, Northbound claims that it was injured because it entered into the APA after relying on defendants' false promises. Plaintiff does not

---

[6]Based on the allegations in the complaint, it is not clear that defendant Leadbot even existed prior to the existence of the APA, and thus at the time of these alleged misrepresentations. It is difficult to envision how a claim for fraudulent inducement to enter into a contract could be maintained against a defendant that did not exist at the time of the allegedly false statements.

12

suggest that the APA was not a valid contract; to the contrary, plaintiff alleges that the APA "is a valid contract" (Compl., ¶ 82). Accordingly, defendants' motion to dismiss the promissory estoppel claim in Count II is granted.

## C.

In Count III, plaintiff alleges that Norvax and Leadbot, LLC, breached the APA by failing to use the Leadbot assets in furtherance of the Leadbot brand; failing to pay the purchase price based on the projections, which were based on a non-discriminatory use of the bid platform; failing to pay a percentage of sales to Leadbot online customers; and failing to act in good faith and fair dealing (Compl., ¶¶ 83-87). Northbound concedes that Messrs. Jones and Ahern, although also named as defendants in this claim, should be dismissed from this claim because they were not parties to the APA (Pl.'s Resp. at 3).

"To state a colorable breach of contract claim under Illinois law, a plaintiff must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Fednav Int'l. Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 839 (7th Cir. 2010) (internal quotations omitted). Defendants do not contend that Northbound insufficiently alleged any of the aforementioned elements. Rather, defendants argue that Count III should be dismissed because all of Northbound's breach allegations are contradicted by the express terms of the APA (Defs.' Reply at 13).

*First*, Defendants argue that Norvax, like Messrs. Ahern and Jones, should be dismissed from this claim because only Leadbot, LLC, was a party to the APA with Northbound (Defs.' Reply at 12-13). Plaintiff contends, however, that Norvax purchased substantially all of Northbound's Leadbot assets under the APA, and thus Norvax became the sole member of Leadbot, LLC (Compl., ¶¶ 13-

14). This pleading is sufficient to allege that Norvax was in privity of contract with Leadbot, LLC, and thus plaintiff's breach of contract claim may stand against Norvax. *See Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 602 (7th Cir. 2001) (explaining that under Illinois law, a cause of action based on a contract may be maintained by a party to that contract, by someone in privity with such a party, or by an intended third-party beneficiary of the contract).

*Second*, defendants contend that Northbound was properly compensated according to the purchase price it agreed to in Exhibit A to the APA (Defs.' Mem. at 12). Defendants' argument is premature. Defendants' claims that the EBITA and the purchase price were properly calculated – and plaintiff's competing claim that the EBITA and the purchase price were depressed through breaches of the APA – are factual issues to be explored during discovery and resolved at a later time.

*Third*, defendants argue that plaintiff cannot assert that the alleged failure to act in good faith and with fair dealing was a breach of contract (Defs.' Reply at 12-13), as plaintiff seeks to do (Compl., ¶¶ 83, 88). Defendants are correct; the covenant of good faith and fair dealing is not an independent source of contractual duties under Illinois law. *Zeidler v. A & W Rests., Inc.*, 301 F.3d 572, 575 (7th Cir. 2002). But, that does not make the doctrine irrelevant to plaintiff's contract claim.

Unless expressly disavowed, the covenant to act in good faith and with fair dealing is an implied promise between parties to every contract in Illinois, *see Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003), and there is no allegation that the covenant was disavowed here. Illinois courts use this covenant to determine the intent of the parties where a contract is susceptible to conflicting constructions, and one party to a contract is given broad discretion in performance. *Id.* The covenant imposes a duty "to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential

14

rather than simultaneous." *The Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992).

Here, Northbound alleges that defendants had broad contractual discretion and the ability to manipulate the purchase price through the bid platform and other means, and they failed to act reasonably, in good faith, or in a manner consistent with the reasonable expectations of the parties as the covenant requires (*see* Compl., ¶¶ 45-46, 49-50, 83-87, 93). Thus, the covenant of good faith and fair dealing, while not an independent basis for a contract claim, provides context for the contract claims that plaintiff has adequately pled.

The doctrine of good faith and fair dealing is particularly relevant to defendants' final contention in seeking to dismiss the contract claim: that plaintiff's allegation that defendants failed to use the Leadbot assets purchased from Northbound in furtherance of the Leadbot brand cannot constitute a breach under the terms of the APA. Paragraph 2(I) of the APA requires Leadbot, LLC, to "use the Assets in furtherance *of its business interests* through the Leadbot brand" (Defs.' Reply at 13 (emphasis in reply, not APA)). Defendants argue that this provision gave them discretion to use the assets purchased from Northbound for the business interests of Leadbot, LLC, even if those interests opposed the interests of the Leadbot brand.

In construing a contract, courts endeavor to give effect to the parties' intent as expressed in the terms of the written agreement. *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 379 (7th Cir. 2009) (citing *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). Where a contract is susceptible to conflicting constructions, and one party to a contract is given broad discretion in performance, we use the covenant of good faith and fair dealing to determine the intent of the parties. *See AB Volvo*, 349 F.3d at 395.

15

Defendants' interpretation of Paragraph 2(I) of the APA as entitling them to use the Leadbot assets without regard to the harm caused to the Leadbot brand is far from self-evident. The provision requires Leadbot, LLC, to use the assets it purchased "in furtherance of its business interests *through the Leadbot brand*" (APA, at ¶ 2(I) (emphasis added)), which brand was to be managed by Messrs. Wagner and McAleer. As we understand defendants' interpretation, the language of Paragraph 2(I) would allow them to use the Leadbot assets to reduce plaintiff's earn-out to zero, as minimizing this expenditure under the APA would be in Leadbot, LLC's interest. To grant defendants' motion to dismiss, we would have to conclude as a matter of law that defendants' interpretation of this language is unambiguous and correct. *See Lewitton*, 585 F.3d at 379. In light of the duty of good faith and fair dealing, we are not prepared to do so.

Therefore, defendants' motion to dismiss Count III is denied.

### D.

In Count IV, the breach of fiduciary duty claim, plaintiff alleges that defendants owed fiduciary duties of care, good faith, and fair dealing to plaintiff because of the structure of the APA, which placed defendants in positions of trust with respect to plaintiff by giving them control over the bid platform and the calculation of Leadbot's EBITA, and, thus, control over the purchase price (Compl., ¶ 93). Defendants argue that they did not owe any fiduciary duties to plaintiff, and that plaintiff fails to allege any facts showing that a special relationship existed between plaintiff and defendants (Defs.' Reply at 10-12).

"A fiduciary relationship exists where, by reason of friendship, agency, or business association and experience, trust and confidence are reposed by one party in another and the latter party gains an influence and superiority over the first as a result." *Tully v. McLean*, 948 N.E.2d 714,

16

73 (Ill. App. Ct. 2011). "The plaintiff has the burden to plead with specificity and prove by clear and convincing evidence the existence of a fiduciary or special relationship." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011). Thus, the complaint must include allegations from which we could infer that plaintiff placed trust and confidence in defendants based on friendship, agency, or experience, or a history of dealings or long-standing relationship between the parties. *Martin v. State Farm Mut. Auto. Ins. Co.*, 808 N.E.2d 47, 51-52 (Ill. App. Ct. 2004).

Plaintiff does not allege any of these indications of a fiduciary relationship. The control, or discretion, described by plaintiff that defendants had over the bid platform, the EBITA, and ultimately the purchase price of the APA, may have triggered the implied covenant of good faith and fair dealing described above, but it did not establish a fiduciary relationship between the parties. Parties to a business agreement are presumed capable of guarding their own interests, and no fiduciary duty arises where one party to a business contract simply trusts the other to fulfill its obligations under the contract. *Yokel v. Hite*, 809 N.E.2d 721, 725 (Ill. App. Ct. 2004). Were it otherwise, virtually any contract dispute could give rise to a corresponding breach of fiduciary duty claim. Thus, defendants' motion to dismiss Count IV is granted.

## E.

In Count V, Northbound contends that defendants committed the tort of conversion in September 2011, two and one-half years after the APA was signed, when they allegedly "'hacked' into a Google Apps for Business accounts . . . operated and maintained by Plaintiff, and changed the password and account administrator so that Plaintiff could not access email accounts, calendars, contact databases and documents associated with leadbot.com, northboundgrou.com [sp.] and other

domains located on the Google servers" (Compl., ¶ 99). Plaintiff alleges that the Google Apps account was not one of the assets transferred to defendant Leadbot under the APA (*Id.*, ¶ 101).

Defendants, however, maintain that plaintiff did not own the Google Apps email account, and thus Northbound's claim for conversion of this property fails (Defs.' Mem. at 3). To state a claim for conversion under Illinois law, Northbound must establish, among other things, that it has a right to the property and that it has an absolute and unconditional right to the immediate possession of the property. *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998). Defendants argue that the Google Apps email account was an asset that was transferred to Leadbot, LLC, pursuant to the APA, and that Leadbot, LLC, merely continued to allow Messrs. Wagner and McAleer to administer the email account as part of their marketing and sales duties as consultants for Leadbot under the APA (Defs.' Mem. at 5).

The APA broadly defines the assets transferred to Leadbot, LLC, in relevant part, as "all owned computers and software located therein, Intellectual Property, all electronic data contained on the servers and computers, . . . , all intellectual property rights possessed by Northbound, all internet domains, websites, software applications, . . . , *unless specifically excluded* in this Agreement" (APA, at ¶ 1(A) (emphasis added)). The APA does not exclude the Google Apps account from the definition of assets being transferred. Thus, the identification of assets transferred under the APA is unambiguous, and includes the Google Apps account. The fact that plaintiff alleges otherwise in the complaint (Compl., ¶ 101) does not trump the clear and unequivocal language of the APA, which also is part of the complaint. To the contrary, "[t]he unambiguous contract controls over contrary allegations in the plaintiff's complaint." *INEOS Polymers Inc. v.*

*BASF Catalysts*, 553 F.3d 491, 498 (7th Cir. 2009) (quoting *McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000)).

We are mindful that whether a contract is ambiguous is often difficult to determine on a motion to dismiss, as it may not be evident whether particular contract terms are "indefinite or have a double meaning." *Lewitton*, 585 F.3d at 379-80. However, this is a situation where the broad contractual definition of assets and the absence of a carve out for the Google Apps account make it clear that this account was part of the assets transferred in the APA. While plaintiff contends that parol evidence will show that the email account was not intended to be transferred to Leadbot, LLC, under the APA (Pl.'s Resp. at 12), "extrinsic evidence cannot be used to create ambiguity where none otherwise exists . . . ." *Lewitton*, 585 F.3d at 380-81. Defendants' motion to dismiss Count V is granted.[7]

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted in part and denied in part (doc. # 17). Defendants' motion is granted in its entirety as to plaintiff's claims of promissory estoppel, breach of fiduciary duty, and conversion (Counts II, IV and V). The motion is granted in part and denied in part as to the fraud claim in Count I: we deny the motion to dismiss Messrs. Jones and Ahern from that claim and deny the motion to dismiss the claim in its entirety, but we grant the motion to the extent that we (1) dismiss Leadbot LLC from that claim, and (2) narrow the claim of fraudulent inducement by Mr. Jones, Mr. Ahern, and Norvax to the alleged statements concerning

---

[7]Defendants further allege that even if plaintiff did own the Google Apps account, e-mail and domain names are not tangible property subject to a conversion claim (Defs.' Reply at 13). This issue has not been decided in Illinois, and in light of our ruling, we need not address it.

the bid platform. Finally, we grant the motion to dismiss Messrs. Jones and Ahern from the contract

claim in Count III, but deny the motion to dismiss that claim as to defendants Norvax and Leadbot.


ENTER:


SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: February 6, 2012

20