IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORTHBOUND GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORVAX, INC., LEADBOT, LLC, | ) | |
| CLINT JONES and MICHAEL AHERN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | Case No. 11 C 6131 |
| | ) | |
| | ) | |
| NORVAX, INC. and LEADBOT, LLC, | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| Defendants and Third Party Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHBOUND GROUP, INC., | ) | |
| BENJAMIN WAGNER and | ) | |
| ROBERT McALEER, | ) | |
| | ) | |
| Plaintiff and Third Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Northbound Group, Inc. ("Northbound" or plaintiff), filed an amended complaint against defendants Norvax, Inc. ("Norvax"), its Chief Executive Officer ("CEO") Clint Jones, its Chief Financial Officer ("CFO") Michael Ahern, and Leadbot, LLC ("Leadbot") (collectively, "defendants"), alleging that the defendants are liable for fraud, promissory estoppel, breach of contract, breach of fiduciary duty, and conversion (doc. # 4). This Court

---

[1]On December 7, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 23, 31).

dismissed the claims for promissory estoppel, breach of fiduciary duty, and conversion; dismissed Leadbot from the fraud claim; narrowed the claim of fraudulent inducement "to the alleged statements about the Bid Platform"; and dismissed Mr. Jones and Mr. Ahern from the contract claim. *Northbound Group, Inc. v. Norvax, Inc.*, No. 11 C 6131, 2012 WL 394336, at *11 (N.D. Ill. Feb. 6, 2012). Subsequently, defendants filed an answer, affirmative defenses, and a three-count counter-claim/third-party complaint: (1) Leadbot against Northbound, its Chief Executive Officer ("CEO") Benjamin Wagner, and its Chief Operating Officer ("COO") Robert McAleer for conversion ("Counterclaim Count I"); (2) Norvax and Leadbot against Mr. Wagner and Mr. McAleer ("counter-defendants") for breach of fiduciary duty ("Counterclaim Count II"); and (3) Norvax and Leadbot against Mr. Wagner, Mr. McAleer, and Northbound for fraud ("Counterclaim Count III") (doc. # 56).

Plaintiff Northbound has filed a motion for partial summary judgment on Count III of the amended complaint (breach of contract) (doc. # 112); defendants Leadbot and Norvax have cross-moved for summary judgment on that claim in its entirety (doc. # 129); defendants Norvax, Mr. Jones, and Mr. Ahern have moved for summary judgment on the fraud claim (Count I of the amended complaint) (doc. # 129); and finally, Northbound and third-party defendants Mr. Wagner and Mr. McAleer seek summary judgment on all three counts of Norvax and Leadbot's counterclaim (Count I: Conversion; Count II: Breach of Fiduciary Duty; and Count III: Fraud) (doc. # 112).

For the following reasons, we grant summary judgment for the defendants on Count I of the amended complaint for fraud and for Norvax on Count III for breach of contract. We grant in part Northbound's motion for partial summary judgment on Count III for the withheld earn-out payments, and grant Leadbot's corresponding motion for summary judgment on Count III

other than for plaintiff's claim for the withheld earn-out payments. We also grant counter-defendants' motion for summary judgment on all three counts of the counterclaim asserted against them.

## I.

As a preliminary matter, we address two motions to strike filed by the plaintiff and counter-defendants, as well as a motion to strike filed by the defendants. *First*, we address the motion of Northbound, Mr. Wagner, and Mr. McAleer (doc. # 134) to strike what they characterize as immaterial facts, inferences, and arguments set forth in defendants' Local Rule 56.1(a) statement of uncontested facts (doc. # 162 (corrected version of doc. # 131)) and their motion to strike and response (doc. # 148) to defendants' Local Rule 56.1(b)(3)(C) statement of additional uncontested facts (doc. # 142). We then consider defendants' motion (doc. # 154) to strike portions of the affidavits of Benjamin Wagner (doc. # 136) and Robert McAleer (doc. # 137) filed in support of Northbound's Response in Opposition to Defendants' Motion for Summary Judgment (doc. # 135).

## A.

Plaintiff and counter-defendants Northbound, Mr. Wagner, and Mr. McAleer have filed a "Motion to Strike Immaterial Facts, Inferences and Arguments Set Forth in Defendants' Local Rule 56.1(a) Statement of Uncontested Facts" (doc. # 134) and a "Motion to Strike and Response to Defendants' Local Rule 56.1(b)(3)(C) Statement of Additional Uncontested Facts" (doc. # 148). Plaintiff and counter-defendants urge this Court to strike the defendants' statement of uncontested facts (doc. # 162) and statement of additional uncontested facts (doc. # 142) because they contain legal argument, mischaracterizations, immaterial and irrelevant statements, statements that contradict documentary evidence, and inadmissible evidence (doc. # 134 at 2-6;

doc. # 148 at 2). Defendants filed a response to the motion to strike their Rule 56.1(a) statement (doc. # 153) and a response to the motion to strike their statement of additional uncontested facts (doc. # 165).

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *see Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (Rule 56.1 statements require "parties to nail down the relevant facts and the way they propose to support them"). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting material relied upon." *Cracco*, 559 F.3d at 632 (citing N.D. Ill. R. 56.1(b)(3)(B)). Also, a nonmovant who seeks to assert facts beyond those fairly responsive to the movant's Rule 56.1(a)(3) statement must do so in a separate statement of additional facts under Local Rule 56.1(b)(3)(C). *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008); *Gray v. Ghosh*, No. 12 C 194, 2013 WL 5497250, at *4 (N.D. Ill. Oct. 3, 2013).

Rule 56.1 statements must identify relevant, admissible evidence supporting material facts, without making factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006). Although we are entitled to demand strict compliance with the Local Rules, we

have broad discretion in deciding whether to do so. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 655 (7th Cir. 2011).

In the present case, while we agree that defendants' Rule 56.1 statements contain some argumentative, immaterial, irrelevant, or duplicative assertions, we are able to separate defendants' properly alleged facts from their improperly asserted statements. Therefore, we deny as moot plaintiff's and counter-defendants' motions to strike (docs. ## 134, 148), and we will accordingly disregard any improper statements. *See, e.g., Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 897 (N.D. Ill. 2010) (denying motions to strike as moot and separating proper from improper allegations); *Alvarado v. Corporate Cleaning Serv., Inc.*, 719 F. Supp. 2d 935, 938 n.2 (N.D. Ill. 2010) (denying motion as moot and disregarding improper factual assertions).

**B.**

The defendants have filed a motion to strike portions of the affidavits of Northbound's CEO Benjamin Wagner (doc. # 136) and its COO Robert McAleer (doc. # 137) on the ground that the affidavits contradict Mr. Wagner's and Mr. McAleer's prior deposition testimony (doc. # 154). Plaintiff filed no response to this motion.

It is well-settled that parties opposing summary judgment may not create issues of fact by contradicting themselves with post-deposition affidavits. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012); *Kalis v. Colgate–Palmolive Co.*, 231 F.3d 1049, 1055 (7th Cir. 2000) ("the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony"). When a declarant contradicts his or her prior deposition testimony, a court must examine the particular circumstances of the change in testimony to determine "whether it is plainly incredible or merely creates a credibility issue for the jury." *Patton v. MFS/Sun Life Fin. Distribs.*, 480 F.3d 478, 488

(7th Cir. 2007). Defendants ask us to strike paragraphs 3 through 6 of Benjamin Wagner's affidavit (doc. # 136), and paragraphs 3, 4, 5, 11 and Exhibits J and K of Robert McAleer's affidavit (doc. # 137).

## 1.

Defendants argue that paragraphs 3 through 6 of the Wagner affidavit and paragraphs 3 through 5 of the McAleer affidavit improperly attempt to assert that in persuading Northbound to sell its assets to start a new business, representatives from Norvax falsely advised Mr. Wagner and Mr. McAleer that its computer systems that matched insurance leads with orders from Norvax's customers (the "Bid Platform")[2] would award bids to the highest bidder (doc. # 154 at 2 – 7). The amended complaint alleged that Mr. Jones and Mr. Ahern "repeatedly represented to Northbound that the Bid Platform did not discriminate among bids and awarded leads to the highest bidder" (doc. # 4 at ¶ 20). In their depositions, Mr. Wagner and Mr. McAleer were both questioned regarding any conversations they had with Norvax executives Mr. Jones and Mr. Ahern in the period preceding the signing of the document that memorialized the business agreement, the Asset Purchase Agreement (doc. # 4, Ex. A: "APA"). They both testified regarding specific meetings with Norvax representatives in which a variety of issues were discussed in anticipation of doing business together, such as possible debt forgiveness, office space, and having the new company proceed as a single company with multiple brands (doc. # 154, Ex. C (Wagner Deposition Excerpts) & Ex. D (McAleer Deposition Excerpts); doc. # 162, Ex. D (Wagner Deposition Excerpts) & Ex. E (McAleer Deposition Excerpts)).

Despite being questioned about – and testifying about – negotiations leading to the APA, neither one ever mentioned any discussions about the Bid Platform or how it functioned.

---

[2]"Bid Platform" refers to the computer systems that Norvax maintained to match leads with orders from customers of Norvax and its affiliates (doc. # 130 at 11 n.3)

Though neither one was explicitly asked whether anyone from Norvax made promises about the Bid Platform, the performance of the Bid Platform was clearly central to Northbound's claim of fraud. One would expect that either Mr. Wagner or Mr. McAleer, or both, would have recalled and recounted such significant representations that allegedly induced them to enter the agreement with Leadbot. But they did not.

Nevertheless, in response to the defendants' motion for summary judgment, Northbound filed affidavits of Mr. Wagner and Mr. McAleer in which they now attest (though without any specificity as to when, where, or to whom) that Mr. Jones made a representation about the Bid Platform: "Jones also represented, prior to entering into the APA, that Norvax's bid platform awarded bids to the highest bidder. Jones also repeated this false statement shortly after entering into the APA" (doc. # 137 ¶ 3; doc. # 136 ¶ 4). In addition, they assert in their affidavits that Mr. Ahern "confirmed" Mr. Jones's representations and that Northbound relied on the representations in entering into the APA (doc. # 136 ¶¶ 5, 6; doc. # 137 ¶¶ 4, 5).

Given the amended complaint's allegations that Mr. Jones and Mr. Ahern "repeatedly" made such representations, we find it noteworthy that during their depositions, neither Mr. Wagner nor Mr. McAleer identified or described any such statements; they did not mention any discussion of Norvax's Bid Platform. Nor do they attempt to explain how or why they now recall that these representations were made, when they did not recall or describe them during their depositions. *See Stanfield v. Dart*, No. 10 C 6569, 2012 WL 6720433, at *4 (N.D. Ill. Dec. 27, 2012) (disregarding fact in affidavit that contradicted deposition lack of recall without explaining subsequent recollection). Consequently, we find the statements an improper attempt to create a material dispute of fact.

Moreover, even were these statements not stricken, they are too conclusory and barren of supporting detail to defeat summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"). Despite having the benefit of discovery, both Mr. Wagner and Mr. McAleer only offer general descriptions of the defendants' purported misstatements, still failing to specify when, where, and how the alleged misrepresentations were made. *Cf. Ghandi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 870 (7th Cir. 2013) (affirming grant of summary judgment and denial of motion to amend complaint where even after discovery, plaintiffs did not specify time, place, or manner of communication of alleged fraudulent misrepresentations). Northbound cannot now create an issue of fact with the vague assertions in these post-deposition affidavits. *See also Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations") (emphasis in original); *Hadley v. Cnty. of DuPage*, 715 F.2d 1238, 1243 (7th Cir. 1983) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted"). Therefore, we grant the motion to strike the portions of paragraphs 4, 5, and 6 of Benjamin Wagner's affidavit[3] and 3, 4 and 5 of Robert McAleer's affidavit that address representations about the Bid Platform.[4]

---

[3]The point is not, as defendants argue, that the affidavits are "self-serving" (doc. # 154 at 2). A statement a party offers in support of a claim naturally will be self-serving in the sense that it is calculated to advance a claim or defense; but, the fact that it is self-serving, standing alone, does not make it out of bounds. *See, e.g., United States v. Funds in Amount of $100,120*, 730 F.3d 711, 717 (7th Cir. 2013).

[4]We decline to strike paragraph three of Mr. Wagner's affidavit, which says nothing about the Bid Platform. In paragraph three, Mr. Wagner recounts a conversation on September 2008 he had with Mr. Jones, in

**2.**

Defendants also seek to strike paragraph 11 of the McAleer affidavit, in which Mr. McAleer states that he created a damages spreadsheet attached to the affidavit as Exhibit J, along with "a narrative detailing the evidence that I relied on in making the computations," attached as Exhibit K (doc. # 137 at ¶ 11, Ex.'s K & L).[5] Defendants point out that at the time of Mr. McAleer's October 29, 2012 deposition, he was unable to recall how he had calculated the damages reflected in an earlier (and somewhat different) damages spreadsheet that had been produced in discovery; nor was he aware of whether any underlying worksheet existed that recorded the analysis he used (doc. # 154 at 7-8 & Ex. D: McAleer Deposition Excerpts at 177:18-24; 180:23-181:1; 184:22-185:3; 185:12-186:5). After his deposition and prior to the close of discovery on November 30, 2012, Mr. McAleer never supplied any underlying documents supporting the spreadsheet or revealing how he calculated the figures in that document.

It was only on June 3, 2013, six months after the close of discovery and in response to the defendants' motion for summary judgment, that plaintiff filed Mr. McAleer's affidavit, which for the first time supplied a "narrative" explanation for the plaintiff's damages calculation (doc. # 137 at Ex. L). But nowhere on the document or in the affidavit does Mr. McAleer describe when he created this "narrative." And, although at the time of his deposition Mr. McAleer could not

---

which Mr. Jones "represented that Norvax could generate between 500 and 1,000 high-quality, search-driven life insurance leads" (doc. # 136 at ¶ 3). Mr. Wagner's statement is supported by two email messages attached to the affidavit and which were used as exhibits in Mr. Jones's deposition (*Id.* at Exs. A & B). Interestingly, this paragraph covers the same subject matter as paragraph two of Mr. McAleer's affidavit (doc. # 137), which the defendants did not move to strike. Consequently, none of the arguments defendants raise in their motion to strike pertain to this paragraph.

[5] Mr. McAleer and the defendants refer to the spreadsheet as Exhibit J and the narrative as Exhibit K to the McAleer affidavit. In the document filed with this Court, however, Exhibit J is an email, Exhibit K is the spreadsheet, and Exhibit L is the narrative document (doc. # 137 at Ex.'s K & L). For the sake of clarity, we use the designations as filed in this Court: Exhibit K for the spreadsheet and Exhibit L for the narrative.

recall how he arrived at his calculations, he does not explain in his affidavit how he came to remember that analysis now. *See Stanfield*, 2012 WL 6720433, at *4. We are mindful that Mr. McAleer asserts generally that "[a]ll of the evidence that I relied on has been produced, primarily by the Defendants, as part of the discovery process in this case" (doc. # 137 at ¶ 11). However, neither Exhibit L nor Mr. McAleer's affidavit identifies any of the documentary evidence on which the spreadsheet is purportedly based. Moreover, defendants contend, without contradiction, that Mr. McAleer's narrative document (Ex. L) was never produced during discovery (doc. # 154 at 9).

Defendants argue that this paragraph of Mr. McAleer's affidavit and the referenced exhibits should be stricken both because they contradict Mr. McAleer's deposition testimony and because they rely on inadmissible evidence. We agree. Because paragraph 11 and Exhibits K and L are inconsistent with Mr. McAleer's deposition testimony and because plaintiff did not produce the worksheet he relied upon during discovery, we grant the motion to strike paragraph 11 and Exhibits K and L. *See Technology Sourcing, Inc. v. Griffin*, No. 10 C 4959, 2013 WL 1828750, at *1 (N.D. Ill. Apr. 30, 2013) (motion to strike damages affidavit granted where affiant had previously testified that he did not know or was noncommittal in response to deposition questions regarding damages); *Divane v. Dunning Elec. Serv., Inc.*, No. 11 CV 4915, 2013 WL 1442219, at *3 (N.D. Ill Apr. 5, 2013) (striking documents attached to affidavit that had not been produced in discovery); *see also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless").

**II.**

Turning to the summary judgment motions, we note that we should resolve an issue on summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013). In deciding a motion for summary judgment, courts "review the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *NES Rental Holdings, Inc. v. Steine Cold Storage, Inc.*, 714 F.3d 449, 452 (7th Cir. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party opposing the motion for summary judgment "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). However, the opposing party cannot rely on mere conclusions and allegations to create factual issues. *Bladerston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).

Summary judgment is a "put up or shut up moment in litigation, . . . by which we mean that the non-moving party is required to marshal and present the court with the evidence [he] contends will prove [his] case. And by evidence, we mean evidence on which a reasonable jury could rely." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal citations and quotation marks omitted). So we will grant summary judgment "if no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (internal quotation marks omitted).

11

# III.

The following facts are drawn from the pleadings and the parties' Local Rule 56.1 submissions. The facts set forth below are undisputed unless otherwise noted by the Court.[6] "We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

Plaintiff/Counter-Defendant Northbound is an Arizona corporation that develops, markets, and distributes marketing and technology services including internet leads for health, life, and annuities to business and individuals (doc. # 56 at ¶ 3; doc. # 4-1: Ex. A: APA at 1). Northbound's Chief Executive Officer is Third-Party Defendant Benjamin Wagner, and Third-Party Defendant Robert McAleer is the Chief Operating Officer and Treasurer (doc. # 63: Third-Party Defendants' Answer to Counterclaims ("3d-Party Answer") at ¶ 4; doc. # 136: Affidavit of Benjamin Wagner, ¶ 1; doc. # 121: Affidavit of Robert McAleer, ¶ 1). Defendant/Counter-Plaintiff Norvax is a Delaware corporation with its principal place of business in Chicago (doc. # 56: Defendants' Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint to Plaintiff's Amended Complaint ("Def.'s Answer") at ¶ 4). Norvax is a health insurance sales and online marketing technology provider; it develops and sells leads to insurance brokers and carriers (*Id.* at ¶ 11). Norvax's Chief Executive Officer is defendant Clint Jones, and defendant Michael Ahern is its Chief Financial Officer (*Id.* at ¶¶ 6, 7). Defendant/Counter-Plaintiff Leadbot is a Delaware limited liability company with its principal place of business in Chicago; Norvax is the sole member of Leadbot (*Id.* at ¶ 5).

---

[6]"In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute, that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Zitzka*, 743 F. Supp. 2d at 899 n.2.

Northbound developed a brand, Leadbot, which generated and purchased life insurance leads (doc. # 56 at ¶¶ 8, 10). In late 2008 and early 2009, Mr. Wagner and Mr. McAleer, on behalf of Northbound, began discussing with Norvax the idea of selling Northbound's assets and intellectual property, including the Leadbot brand (*see* doc. # 61: 3d-Party Answer at ¶¶ 10, 14, 15, 19). In February 2009, Norvax formed a limited liability company, which it named Leadbot (choosing for its name the brand being acquired) for the purpose of purchasing all of Northbound's assets (doc. # 56: Defendants Norvax and Leadbot's Counterclaim and Third Party Complaint at ¶ 16). Leadbot and Northbound entered into the APA, dated February 27, 2009 (doc. # 56: Def.'s Answer at ¶ 13). As part of the APA, Leadbot purchased all of Northbound's "Assets" (doc. # 61: 3d-Party Answer at ¶ 19).[7] Leadbot agreed to pay Northbound a purchase price that would be determined based on the earnings before interest, tax, and amortization ("EBITA") achieved by Leadbot during three one-year periods: (1) 40% of Leadbot EBITA from March 1, 2009 to March 31, 2010; (2) 25% of Leadbot EBITA from April 2010 to March 31, 2011; and (3) 20% of Leadbot EBITA from April 1, 2011 to March 31, 2012 (APA, Ex. A; doc. # 61: 3d-Party Answer at ¶ 22; doc. # 133: Defendant's Response to Plaintiff's and Counter-Defendants' Statement of Uncontested Material Facts at ¶ 4). On August 1, 2010, the Leadbot EBITA earn-out was amended as follows:

1) To December 31, 2010: Sellers will be paid 40% of Leadbot EBITA
2) January 1, 2011 to June 30, 2011: Sellers will be paid 30% of Leadbot EBITA
3) July 1, 2011 to June 30, 2012: Sellers will be paid 25% of Leadbot EBITA*

---

[7]"Assets" are defined in the APA as "all property, rights, and other assets connected to or associated with the Northbound business. This definition expressly includes, but may not be limited to: all owned computers and software located therein, Intellectual Property, all electronic data contained on the servers and computers, all owned furniture in the building, all fixtures, the labor and/or employment contracts for employees that are employed by Northbound at that address, all customer contracts, all other customer relationships, all intellectual property rights possessed by Northbound, all internet domains, websites, software applications, vendor supply relationships, rights to the Leadbot d/b/a, and all other owned property at that address or affiliated with or used in the Northbound business, unless specifically excluded in this Agreement" (doc. # 4, Ex. A at 1).

*For each month during which EBITA is [sic] exceeds $59,999.99, Sellers will be paid 30% of EBITA.

(doc. # 126 at 66: APA, Amendment 2 to Ex. A).[8]

In April 2009, Mr. Wagner became Vice President of Business Development and Mr. McAleer became Vice President of Lead Programs for Leadbot (doc. # 61: 3d-Party Answer at ¶¶ 25-27). Shortly after entering into the APA, the relationship between the parties soured. Northbound contends that Norvax's Bid Platform was discriminating against bids by Leadbot, significantly limiting the number and quality of the leads provided to it (doc. # 4: Am. Cmpl. at ¶¶ 33-45). In February 2010, Norvax representatives informed Northbound that Norvax would impose limits upon Leadbot's sales to health insurance lead customers who were also customers of Norvax; Norvax claims that it did so because Mr. McAleer and Mr. Wagner were abusing their access to Norvax's confidential customer contact list in order to increase their earn-out under the APA (doc. # 56: Def.'s Answer at ¶ 35).

Although Leadbot initially paid a monthly earn-out to Northbound, when Northbound filed its complaint in this case in September 2011, Leadbot withheld the earn-out payments from Northbound for the months of August 2011 through June 2012 (the end of the amended earn-out period) (doc. # 133: Defendant's Response to Plaintiff's and Counter-Defendants' Statement of Uncontested Material Facts at ¶ 6).

## IV.

We now turn to the merits of the various motions for summary judgment. We first take up the cross-motions of plaintiff Northbound and defendants Norvax and Leadbot regarding the contract claim (Count III of the amended complaint). We then turn to the motion of defendants Norvax, Mr. Jones, and Mr. Ahern for summary judgment on the fraud count of the amended

---

[8]Amendment 2 to Exhibit A of the APA also memorialized agreements regarding several debts Northbound owed to Norvax and imposed a reduction in the operating budget, among other things (doc. # 126 at 66).

complaint (Count I). And finally, we consider the motion of plaintiff Northbound and third-party defendants Mr. Wagner and Mr. McAleer for summary judgment on all three counts of the counterclaim filed by third-party plaintiffs Norvax and Leadbot.

## A.

Both sides in this dispute have moved for summary judgment on the breach of contract claim (Count III of the amended complaint). Plaintiff Northbound has moved for partial summary judgment contending that the APA is a valid contract and Leadbot has breached it by failing "to pay Plaintiff the Purchase Price for each month from August 2011 (when Plaintiff filed the Amended Complaint) through June 2012" (doc. # 113: Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment at 3-4). Defendant Norvax has moved for summary judgment on the ground that it was not a party to the APA and therefore cannot be liable for breach (doc. # 130 at 15). Defendant Leadbot contends that it is entitled to summary judgment because Leadbot has not breached Paragraph 2(I) of the APA (*Id.* at 16-18; APA at 8)). Defendant Leadbot also asserts that the APA did not require it to pay a purchase price based on projections of Leadbot's earnings from life insurance leads, because those projections were never attached to the APA and because the purchase price was specified in Exhibit A to the APA, which calculated payments based upon a formula predicated upon actual future sales (*Id.* at 19). We address each of these motions in turn.

## 1.

Northbound seeks partial summary judgment for its monthly earn-out under the APA from August 2011 through June 2012 that Leadbot has withheld. Under Illinois law,[9] a plaintiff alleging breach of contract must show: "(1) the existence of a valid and enforceable contract; (2)

_____

[9]The APA specifies that "[t]his Agreement shall be governed by the laws of the state of Illinois" (APA at 24-25).

plaintiff's performance of all required contractual conditions; (3) defendant's breach of the terms of the contract; and (4) damages resulting from the breach." *Lindy Lu LLC v. Ill. Cent. R.R. Co.,* 984 N.E.2d 1171, 1175 (Ill. App. Ct. 2013).

Northbound has presented evidence sufficient to establish that on February 27, 2009, Northbound entered into a contract, the APA, with Leadbot. In consideration of the acquisition of substantially all of Northbound's assets, as defined in the APA, Leadbot agreed to pay a purchase price calculated using a formula specified in Exhibit A to the APA: a monthly earn-out based upon based on percentages of the EBITA achieved by Leadbot during three one-year periods, ending March 31, 2012 (APA, Ex. A; doc. # 56: 3d-Party Compl. at ¶¶ 21, 22; doc. # 133: Defendant's Response to Plaintiff's and Counter-Defendants' Statement of Uncontested Material Facts at ¶ 4). On August 1, 2010, the Leadbot EBITA earn-out was amended to increase the percentage of the period covered by subparagraph 3, and to extend the payout period to June 30, 2012 (doc. # 126 at 66: APA, Amendment 2 to Ex. A; doc. # 133 at ¶ 5). It is undisputed that Leadbot achieved earnings during the period from August 2011 through June 2012, but did not make any earn-out payments to Northbound for that period (doc. # 133 at ¶ 6). Northbound contends that the amount of the withheld earn-out is $56,204.03, based on Leadbot's profit and loss statements for August 2011 through June 2012 produced during discovery (doc. # 114 at ¶ 7 & doc. # 117: Ex. D).

Leadbot acknowledges that it continued to "calculate the earn-out based on the APA without regard to the parties' pending claims and segregated such funds pending the termination of the litigation" (doc. # 132 at 5). Leadbot nonetheless opposes Northbound's motion on the grounds that: (1) the contract claim in the amended complaint does not assert that Leadbot breached the APA by withholding earn-out payments (*Id.* at 4-5); (2) the affirmative defenses

and counterclaim raise a triable issue as to whether Northbound is entitled to any further payments under the APA (*Id.* at 5); and (3) Northbound agreed (or ratified Leadbot's decision) to suspend the exchange of assets or cash between Northbound and Leadbot during the pendency of the litigation (*Id.* at 4). None of Leadbot's arguments justifies withholding the earn-out payments.

*First*, Northbound's contract claim in its amended complaint contained no allegations about Leadbot's failure to pay the earn-out purchase price because it was not clear to Northbound that Leadbot was withholding the earn-out payments until after the amended complaint was filed on September 19, 2011 (doc. # 4; doc. # 149 at 3).[10] Northbound had already pled a breach of contract claim. It did not need to amend its complaint to include allegations regarding Leadbot's subsequent failure to pay the earn-out.

*Second*, as explained below, we grant summary judgment for Northbound on all three counts of the defendants' counterclaim. Consequently, the counterclaim provides no basis for Northbound to retain the payments owed under the APA. In addition, Leadbot failed to develop its argument that its affirmative defenses – it mentions only unclean hands and estoppel – justify its withholding of the remaining earn-out payments, relegating its discussion of affirmative defenses to a single sentence with unenlightening case cites in a footnote in its brief (doc. # 132 at 5 n.2). That alone would be enough to dispose of the affirmative defenses. *See Jordan v. Binns*, 712 F.3d 1123, 1134 (7th Cir. 2013); *Schrock v. Learning Curve Int'l, Inc.*, 744 F. Supp. 2d 768, 770 n.1 (N.D. Ill. 2010) ("Undeveloped arguments and arguments raised in footnotes are waived." (citing *Goren v. New Vision Int'l*, 156 F.3d 721, 726 n.2 (7th Cir. 1998); *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989)). Regardless, the affirmative defense of unclean

---

[10]Leadbot had not yet paid the earn-out due for the month of August 2011 at the time the initial complaint was filed on September 2, 2011, and has withheld that payment and all subsequent payments through the end of that earn-out period in June 2012.

hands would not apply to the contract count, given that Northbound is seeking a legal remedy: money damages. *See, e.g.*, *RBS Citizens, N.A. v. Sanyou Import, Inc.*, No. 11 C 1820, 2011 WL 2712744, at *4 (N.D. Ill. July 13, 2011); *Zahl v. Krupa*, 850 N.E.2d 304, 309-10 (Ill. App. Ct. 2006) (unclean hands doctrine bars only equitable remedies and does not affect legal rights). In addition, the affirmative defense of estoppel fails for the same reasons we grant summary judgment below on the counterclaim counts: defendants failed to supply sufficient specific evidence to raise triable issues of fact on the alleged bad acts supporting these claims. [11]

*Third*, Leadbot offers no evidence that could lead a jury to reasonably find that Northbound agreed, or ratified Leadbot's decision, to suspend earn-out payments. However, Leadbot argues that Northbound ratified defendants' withholding of payments by citing to Mr. Wagner's deposition testimony that he elected not to return a laptop computer to Norvax because "at that point, based on the conversation we just had, I decided to follow the no assets, no cash changing hands while the dispute was ongoing" (doc. # 132 at 4). Nevertheless, in April 2013, Mr. Wagner returned the laptop to Leadbot (doc. # 114 Ex. G at ¶¶ 12 - 14). "[R]atification of an unauthorized act is tantamount to an original authorization and confirms what was originally unauthorized." *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 280 (Ill. 2004). The principle underlying the doctrine is that the person ratifying gains "a benefit through the actions of another who is acting on his behalf with apparent or implied authority." *Id.* Leadbot's ratification argument fails because "[i]f there is no benefit [to the party alleged to have ratified], ratification will not be implied." *Id.*

---

[11]Moreover, even had Leadbot been justified in withholding payments pending the termination of the litigation due to the counterclaim and affirmative defenses, that would no longer justify withholding of payment as we have resolved these matters against Leadbot on summary judgment and have brought the case to a close except for the calculation of the amount of the withheld earn-out payments and any associated prejudgment interest.

Therefore, we grant Northbound's motion for partial summary judgment on the contract claim for the recovery of the withheld earn-out payments from August 2011 through July 2012, but limited to the question of liability for that withheld payment. At this time, we cannot fix the amount of recovery on that claim. Northbound in its Rule 56.1 statement supplied what appears to be Leadbot's profit and loss statements from that period of time to support its damages amount of $56,204.03, but there are several problems with the document (doc. # 114 at ¶ 7; doc. # 117). *First*, it is nearly impossible to read – the print is tiny and blurry. *Second*, to the extent we can read it, it appears that there are two possible numbers for the earn-out – an "Adjusted Leadbot Portion of Earn-out" and an "Original Leadbot Portion of Earn-out" (doc. # 117: Ex. D). *Third*, in "Defendants' Response to Plaintiff's and Counter-Defendants' Statement of Uncontested Material Facts," defendants dispute the amount, contending that Exhibit D does not "support the assertion made" (doc. # 133 at ¶ 7). Leadbot makes no effort to reveal what it believes the proper amount to be, despite its assertion that it dutifully calculated and segregated the APA earn-out funds pending the litigation (doc. # 132 at 2, 5). Presumably, the amount will be $56,204.03 or some lesser amount – along with prejudgment interest. We will set a schedule for a proceeding to prove up the specific amount, unless the parties stipulate to a figure.

We address two remaining issues regarding Northbound's claim based on the failure to pay the earn-out from August 2011 through June 2012. Northbound seeks punitive damages on this claim. However, as a general rule, under Illinois law punitive damages are not recoverable for a breach of contract. *Morrow v. L.A. Goldschmidt Assoc., Inc.*, 492 N.E.2d 181, 184 (Ill. 1986); *Leyshon v. Diehl Controls North America, Inc.*, 946 N.E.2d 864, 877 (Ill. App. Ct. 2010) ("punitive damages may not be awarded for a breach of contract, even if the breach was willful"); *see Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir.

2008) ("punitive damages can be awarded in a suit for an intentional tort, such as fraud, but not

(with rare exceptions, . . .) in a suit for breach of contract") (internal citations omitted).

"[P]unitive damages are recoverable where the breach amounts to an independent tort and there

are proper allegations of malice, wantonness or oppression." *Morrow*, 492 N.E.2d at 184

(internal quotation marks and citation omitted). But a breach of contract does not become a tort

merely because the breach was willful and wanton. *Id*. at 185. Northbound has failed to offer

evidence from which a jury reasonably could find that Leadbot's withholding of the earn-out

payments amounted to an independent tort. Consequently, we deny Northbound's request for

punitive damages.

Finally, Northbound is not entitled to attorneys' fees and costs. Northbound relies on

section 8(c) of the APA, which is a general indemnity clause:

> [Leadbot] shall indemnify and hold harmless Northbound . . . from and against
> any and all losses, costs, third-party claims, damages, liabilities and expenses
> arising out of or relating to [Leadbot's] performance under this agreement or any
> claims arising out of [Leadbot's] operation of its business or use of the Assets
> following the Closing Date.

(APA at 25-26). It is well-settled that Illinois indemnity contracts must be strictly construed.

*Downs v. Rosenthal Collins Grp., LLC*, 895 N.E.2d 1057, 1058 (Ill. App. Ct. 2008). With

respect to awards of attorneys' fees, the prevailing rule in the United States, often referred to as

the "American Rule," is that in the absence of statutory authority or a contractual agreement

between the parties, a successful litigant may not recover attorneys' fees or the costs of the

litigation from his adversary. *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240,

247 (1975). Illinois has long adhered to this rule. *See In re Weinschneider*, 395 F.3d 401, 404

(7th Cir. 2005); *Downs*, 895 N.E.2d at 1059; *Baksinski v. Northwestern Univ.*, 595 N.E.2d 1106,

1109 (Ill. App. Ct. 1992). Here, the indemnity clause contains no explicit language creating a

right to reimbursement for attorneys' fees and costs. We therefore conclude that the indemnity clause does not entitle Northbound to its fees and costs in this action. *Downs*, 895 N.E.2d at 1059 (indemnification clause that did not expressly include attorneys' fees did not entitle member to recover those fees).

**2.**

Defendant Norvax asserts that it is entitled to summary judgment on the breach of contract claim because it was not a party to the APA (doc. #130 at 15). In our decision on the motion to dismiss, we observed that while Leadbot and Northbound are the only parties that entered into the APA, Northbound had pled that Norvax had purchased all of Northbound's Leadbot assets under the APA and that Norvax had become Leadbot's sole member. *Northbound Group, Inc. v. Norvax, Inc.*, No. 11 C 6131, 2012 WL 394336, at *7 (N.D. Ill. Feb. 6, 2012). We found this sufficient to withstand the motion to dismiss. *Id.* Northbound continues to assert that Norvax is liable for a breach of the APA because Norvax essentially took on Leadbot's obligations under the APA, by dint of being the sole member of Leadbot and by using assets of its own to further the goals of the APA (doc. # 135 at 6).

However, it is one thing to plead a claim, and quite another thing to prove one. The summary judgment record presented in this case shows that Northbound has failed to offer evidence sufficient to create a triable issue on its contract claim against Norvax.

Norvax is the sole member of Leadbot, LLC. But that does not, on its own, supply a basis to impose liability on Norvax for the contractual obligations of Leadbot. While we found that Northbound's allegations against Norvax sufficient to survive under the generous standards applied to a motion to dismiss, Northbound's summary judgment offering has not demonstrated a triable issue as to whether there is privity of contract between Northbound and Norvax.

Consequently, Norvax cannot be liable for breach of a contract to which it was not a party. *See, e.g.*, *Odeluga v. PCC Community Wellness Ctr.*, No. 12–cv–07388, 2013 WL 4552866, *4 (N.D. Ill. Aug. 27, 2013) ("Only parties to a contract can be liable for breach of contract"); *Phillips v. WellPoint Inc.*, No. 10-cv-00357-JPG, 2012 WL 6111405, at *9 (S.D. Ill. Dec. 10, 2012) ("As a basic principle of contract law, a non-party cannot be held liable for a breach of contract").

Leadbot is a Delaware limited liability company, set up under the Delaware law governing limited liability companies. Delaware law contains the following provision regarding the potential liabilities of members:

> § 18-303. Liability to third parties
> (a) Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.
> (b) Notwithstanding the provisions of subsection (a) of this section, under a limited liability company agreement or under another agreement, a member or manager may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company.

DEL. CODE ANN. tit. 6 § 18-303. Northbound has offered no evidence that Norvax agreed to be liable for Leadbot's debts, obligations, and liabilities or that there is a provision to that effect in Leadbot's articles of organization (which have not been included in any pleadings before the Court). Consequently, Norvax's status as sole member of Leadbot, LLC does not suffice on its own to impose liability on Norvax for Leadbot's contractual obligations.

In addition, although Northbound contends that Norvax took on some of Leadbot's responsibilities under the APA and even used some of its own resources to advance the business, Northbound has neither pled nor explicitly argued an alter ego or veil-piercing theory; nor has it offered sufficient evidence to create a triable issue on these theories, even had they been pled.

*See Phillips*, 2012 WL 6111405 at \*9; *Sunny Industries, Inc. v. Rockwell Intern. Corp.*, No. No. 96–C–1020–C, 2002 WL 32345675, at \*8–9 (W.D. Wis. Feb. 5, 2002). To the extent Northbound is attempting to raise a veil-piercing or alter ego theory, it has not sufficiently articulated or supported them, and therefore we deem those theories waived. "Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006); *see also Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 718 (7th Cir. 2012) ("[i]t is the parties' responsibility to allege facts and indicate their relevance under the correct legal standard"); *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) ("it is not this court's responsibility to research and construct the parties' arguments").

Finally, Northbound argues that Norvax breached the APA by "assuming, and then failing, to manage lead generation for the Leadbot Brand" (doc. # 135 at 12; doc. # 141 at 12-13). In other words, Northbound now asserts that Norvax modified the contract and subsequently breached the modified contract. This theory is also unavailing. *First*, Northbound offers no legal support for the proposition that a non-party may modify a contract between contracting parties. *Second*, contract modification must "satisfy all criteria essential for a valid contract, including offer, acceptance, and consideration*." Ross v. May Co.*, 880 N.E.2d 210, 215 (Ill. App. Ct. 2007). Again, Northbound makes no effort to offer evidence that could show that these criteria have been met.

Northbound has not provided any legal or factual basis to support its claim that Norvax breached a contract to which it was never a party. Consequently, we grant summary judgment for Norvax on the contract claim (Count III of the amended complaint).

**3.**

Leadbot has also moved for summary judgment on the contract claim. Because we have granted Northbound's motion on this claim for the withheld earn-out payments, we consider Leadbot's motion on this issue only to the extent that Northbound's contract claim asserts other breaches with damages beyond those withheld payments. Although the nonmoving party need not prove his case at the summary judgment stage, he must present a factual basis that would allow a jury to reasonably find in his favor. In order to prevail in a breach of contract action, plaintiff has to prove all four elements of his claim: existence of a contract, his performance of the contract, breach of the contract by defendant, and the existence of damages resulting from the breach. *Lindy Lu LLC,* 984 N.E.2d at 1175. If the nonmoving party cannot establish an essential element of his cause of action, summary judgment is proper. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012) (summary judgment is proper where a "nonmoving party is unable to establish the existence of an essential element to [that party's] case, and on which [that party] will bear the burden of proof at trial"). Because Northbound has not established a genuine issue of material fact on the element of breach, we grant Leadbot's motion for summary judgment on the contract claim for damages (other than for the withheld earn-out payments discussed above).

In Northbound's amended complaint, it alleges that Leadbot and Norvax breached the APA by failing to perform each of the following "requirements of the APA": (1) "to act in good faith and fair dealing with respect to Plaintiff and the Leadbot Assets;" (2) "to use the Leadbot Assets in furtherance of the Leadbot brand;" (3) "to pay the Purchase Price based on the projections;" and (4) "to pay Plaintiff a percentage of sales to Leadbot Online Customers" (doc. # 4 at ¶¶ 83-88). Northbound has not put forward any evidence on the third and fourth alleged breaches. Indeed, it does not dispute that the purchase price was that specified in Exhibit A to

the APA and Amendment 2 to Exhibit A, which was an earn-out based on the EBITA of Leadbot during three one-year periods (doc. # 131 at ¶¶ 38, 39; doc. # 170 at ¶¶ 38, 39). Instead, Northbound opposes Leadbot's motion by contending that Leadbot breached paragraph 2(I) of the APA by failing to use the assets in furtherance of the Leadbot brand, and that Leadbot breached its covenant of good faith and fair dealing.

Paragraph 2(I) of the APA states that "Acquisition [defined in the initial paragraph of the APA as Leadbot LLC] will use the Assets in furtherance of its business interests through the Leadbot brand" (APA at 8). The APA defines "Assets," in pertinent part, as "all property, rights, and other assets connected to or associated with the Northbound business" (APA at 1). The definition included customer contracts, customer relationships, all intellectual property rights, all internet domains, websites, and vendor supply relationships, among other items specified in exhibits and schedules attached to the APA (*Id.*).

In its effort to establish a breach of the requirements of paragraph 2(I), Northbound offers a variety of deposition and affidavit excerpts, all of which appear to deal with alleged failures by Norvax (rather than Leadbot) to provide leads, use websites, or fulfill orders (doc. # 141 at 5-6).[12] As explained above, however, Norvax was not a party to the APA and was not bound by its terms. Thus, we find that Northbound has not established a dispute of material fact regarding whether Leadbot breached an express term of the APA: paragraph 2(I).

Similarly, Northbound has not generated a triable issue of fact on its claim that Leadbot breached its duty under an implied covenant of good faith and fair dealing. The Illinois courts have stated that every contract implies good faith and fair dealing between the parties to it.

---

[12] Even had the same evidence Northbound offers actually been focused on Leadbot, it still would not have created a triable issue of fact on this issue. The APA language required Leadbot to "use" the assets, but did not require that Leadbot use *all* of the assets. Northbound's evidence merely suggests that Norvax only used some of the assets. This is not sufficient to raise a jury question on breach. There is nothing to suggest that *no* assets were used, or that those assets that were used were *not* used in furtherance of the Leadbot brand.

25

*Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1444 (7th Cir. 1992); *see also Wilson v. Career Educ. Corp.*, 729 F.3d 665, 673 (7th Cir. 2013) (Darrow, District Judge, concurring). However, under Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract. *Wilson*, 729 F.3d at 673-74. Instead, the covenant guides the construction of explicit terms in an agreement. *Id.* Northbound argues that because the APA afforded Leadbot discretion in meeting its obligations under the agreement, the covenant comes into play to ensure that Leadbot exercised that discretion consistent with good faith and fair dealing (doc. # 135 at 7-8).

Northbound contends that determining whether a party has conformed to the requirements of good faith and fair dealing is a fact question that precludes summary judgment. However, in the instant case, we do not find that there is a dispute of material fact on this issue. As explained above, Norvax is not a party to the APA and therefore is neither bound by the express terms of the APA, nor the implied covenant of good faith and fair dealing. Because Northbound has focused on the actions (or inaction) of *Norvax* in its efforts to show bad faith, it has failed to demonstrate a triable issue of material fact regarding whether *Leadbot's* actions in any way ran afoul of the requirements of good faith and fair dealing. Indeed, in its brief opposing summary judgment on this issue, Northbound cites no evidence to show that it has raised a jury question on this issue. Accordingly, we grant Leadbot's motion for summary judgment (doc. # 129) on the breach of contract claim seeking damages beyond the earn-out specified in the APA.[13]

---

[13]Apart from Northbound's failure to establish a triable issue of fact on the issue of breach (beyond the withholding of the earn-out payments), it has also not offered sufficient competent evidence to generate a material disputed issue of fact on the element of damages (again, beyond the earn-out specified in the APA). The only evidence Northbound offered on damages was from paragraph 11 and Exhibits K and L to the McAleer affidavit. However, as we have explained above (see pp. 9-10), we have stricken that evidence, because it was not produced in discovery; because Mr. McAleer does not identify the underlying documentary evidence on which he purportedly relied in creating the damages documents, beyond the airy avowal that "[a]ll of the evidence that I relied on has been

26

**B.**

Defendants Norvax, Mr. Jones, and Mr. Ahern seek summary judgment on the fraud claim (Count I of the amended complaint) (doc. # 129). They assert that despite Northbound's allegations that Mr. Jones and Mr. Ahern "repeatedly represented" that Norvax's Bid Platform awarded insurance leads to the highest bidder (doc. # 4 at ¶¶ 19-20), Northbound has failed to identify a single, specific conversation in which Mr. Jones or Mr. Ahern made such representations (doc. # 130 at 11-13). In addition, defendants assert that Northbound has provided no evidence that it relied on any such misstatement about the Bid Platform while entering into the APA (*Id.* at 14).

We agree. To prevail on a fraud claim under Illinois law,[14] a party must prove the following elements by clear and convincing evidence: "(1) a false statement of material fact; (2)

---

produced, primarily by Defendants, as part of the discovery in this case" (doc. # 137 at ¶ 11); and because the damages evidence he now offers contradicts without explanation Mr. McAleer's deposition testimony. Nor can plaintiff say that it is premature for it to have its damages evidence: all discovery has closed, and on April 30, 2013, plaintiff represented that it would not seek to use any experts in this case – which would include damages experts.

What's more, even had we not stricken that evidence, we would not be persuaded that the evidence would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(2) (a party may object that the material. . . cannot be presented in a form that would be admissible at trial). "In Illinois, in order to recover for breach of contract, a plaintiff must establish both 'that he sustained damages and he must also establish a reasonable basis for computation of those damages.' . . . The party claiming damage bears the burden of proving those damages to a reasonable degree of certainty." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007) (quoting *Ellens v. Chicago Area Office Fed. Credit Union*, 576 N.E.2d 263, 267 (Ill. App. Ct. 1991)) (internal brackets and ellipsis omitted).

Under Illinois law, new businesses have great difficulty establishing damages based upon lost profits to a reasonable degree of certainty, even using expert testimony. "A plaintiff may satisfy the requirement of proving with a reasonable basis or with reasonable certainty damages for claimed lost profits through evidence of past profits in an established business. Generally speaking, however, courts consider evidence of lost profits in a new business too speculative to sustain the burden of proof." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407 (Ill. 2006). Northbound has not attempted to tie its damages analysis under the APA to the prior performance of the Leadbot business when it was part of Northbound. We cannot see how the proposed McAleer testimony, based on his affidavit and exhibits, would do anything beyond inviting a jury to speculate about what profits might have been realized for this new venture. *See Smart Marketing Group Inc. v. Publ'ns Int'l Ltd.*, 624 F.3d 824, 829-34 (7th Cir. 2010) (vacating jury's damages verdict in a lost profits case for a new business based on internet lead generation where both sides had offered expert testimony).

[14]No party raises a choice of law issue on this claim, and therefore, we apply the law of the forum state, Illinois. *See Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013) (state law applies to substantive issues when federal

27

the defendant knew the statement was false; (3) the defendant intended that the statement induce the plaintiff to act; (4) the plaintiff relied upon the truth of the statement; and (5) the plaintiff suffered damages from his reliance on the statement." *Aasonn, LLC v. Delaney*, 961 N.E.2d 939, 951 (Ill. App. Ct. 2011). Accordingly, a fraud claim that lacks any specific fraudulent representations cannot withstand summary judgment. *Cf. id.* ("A complaint for common-law fraud must allege, with specificity and particularity, facts from which fraud is the necessary or probable inference, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made. Conclusory allegations are insufficient.") (internal quotation marks and citations omitted). Even were we to consider the stricken paragraphs from Mr. Wagner and Mr. McAleer's post-deposition affidavits, Northbound would not have sufficient evidence to withstand summary judgment on this claim because those paragraphs lack the specificity necessary to create a triable issue. *See LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 569 (7th Cir. 1991) (applying clear and convincing evidentiary standard in affirming summary judgment dismissing a fraud claim); *see also JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 864 (7th Cir. 2013) (required clear and convincing evidence to survive summary judgment on fraudulent inducement defense).

Mr. Wagner and Mr. McAleer state that "Jones also represented, prior to entering into the APA, that Norvax's Bid Platform awarded bids to the highest bidder. Jones also repeated this false statement shortly after entering into the APA" (doc. # 137 ¶ 3; doc. # 136 ¶ 4). In addition, they assert that Mr. Ahern "confirmed" Mr. Jones's representations (doc. # 136 ¶ 6; doc. # 137 ¶ 5). These general assertions lack the factual detail required to raise a jury question on this issue. Although they identify the individuals who allegedly made the representations, they do not

court jurisdiction is premised on diversity and when neither party raises a conflict of law issue, the court applies the law of the state in which it sits); *Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610, 611-12 (7th Cir. 2012).

reveal the time, place, or manner in which these alleged statements were made. *See, e.g.,* *Snorton-Pierce v. Ill. State Tollway Auth.*, No. 09 C 07995, 2012 WL 1080128, at *5-6 (N.D. Ill. Mar. 30, 2012) (affidavit lacked sufficient factual detail, such as the identity of the supervisor she told about her condition and the time period for which she requested leave); *see also* Fed. R. Civ. P. 56(c)(4) (an affidavit opposing a motion for summary judgment must "set out facts that would be admissible in evidence"); *cf. Ghandi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 870 (7th Cir. 2013) (affirming grant of summary judgment and denial of motion to amend complaint where even after discovery, plaintiffs did not specify time, place, or manner of communication of alleged fraudulent misrepresentations).

In its response to the defendants' motion for summary judgment, Northbound did not answer the argument that it had failed to offer sufficient proof of the allegedly repeated representations about the Bid Platform, but merely repeated the general assertions from the McAleer and Wagner affidavits. In addition, Northbound contended that it relied on representations that Norvax could generate 500 to a 1,000 life insurance leads a day (doc. # 135 at 3-4). This assertion also fails to raise a jury question on the fraud claim. A statement that defendants *could* generate such numbers of leads is either a prediction or an opinion. Neither provides a basis for a fraud claim. *See Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) (citing *Bradley Real Estate Trust v. Dolan Assocs. Ltd.*, 640 N.E.2d 9, 12-13 (Ill. App. Ct. 1994)) ("promissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud"); *Rasgaitis v. Waterstone Fin. Grp., Inc.*, 985 N.E.2d 621, 634 (Ill. App. Ct. 2013) ("Generally an expression of opinion will not support an action for fraud"); *see also Ill. Non-Profit Risk Mgmt. Ass'n v. Human Serv. Ctr. of S. Metro-East*, 884

29

N.E.2d 700, 723 (Ill. App. Ct. 2008) ("financial projections are considered to be statements of opinion, not fact"). Northbound has offered no evidence that this statement was false when made or that defendants knew it was false. Consequently, we grant summary judgment for defendants Northbound, Mr. Jones, and Mr. Ahern on the fraud claim (Count I of the Amended Complaint).

## C.

Northbound, Mr. Wagner, and Mr. McAleer have also moved for summary judgment on Counts I (Conversion), II (Breach of Fiduciary Duty), and III (Fraud) of the counterclaim (doc. # 112). For the reasons stated below, we grant their motion on all three counts.

## 1.

In Count I of the Counterclaim and Third-Party Complaint, Leadbot asserts a state-law[15] conversion claim against Northbound, Mr. Wagner, and Mr. McAleer for allegedly retaining property that Leadbot purchased from Northbound under the APA (doc. # 56: 3d Party Cmplt. at ¶¶ 38-43). Specifically, Leadbot contends that in September 2011, it requested that Northbound, Mr. Wagner, and Mr. McAleer return "the computers that Leadbot purchased for their use and all other 'assets' as defined by the APA that were in their possession and control, including furniture" (*Id.* at ¶ 40).

Northbound, Mr. Wagner, and Mr. McAleer respond that the only "asset" under the APA that they possessed was a laptop computer, which they returned in April 2013 (doc. # 113 at 7, citing doc. # 114, Ex. G: Wagner Affidavit, ¶¶ 10-14, Ex. H: McAleer Affidavit, ¶¶ 10-11). Leadbot admits that the laptop has been returned, but contends that Northbound and counter-defendants still possess Leadbot's furniture that they are holding in a storage facility in Arizona

---

[15]Again, the parties do not raise a choice of law issue, so we apply Illinois law. *See Ball*, 723 F.3d at 821.

(doc. # 132 at 10-11; doc. # 142 at ¶ 35). Significantly, Leadbot states that "[a]ll of the furniture is owned by Northbound as the bank and/or leasing company has released its lien" (doc. # 142 at ¶ 35).

Therein lies the flaw in Leadbot's conversion claim. To prevail on a conversion claim, a party must establish that it (1) has a right to the property, (2) it has an absolute and unconditional right to immediate possession of the property, (3) it made a demand for possession, and (4) Northbound and counter-defendants wrongfully and without authorization assumed control, dominion, or ownership over the property. *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008). At a minimum, to succeed on a conversion claim, Leadbot must be able to establish a possessory interest in some property with which Northbound and the counter-defendants have interfered. But as of the date of the APA, Northbound did not own any furniture; instead, it leased furniture for its offices (doc. # 125 at 50) (Schedule 2.D.III. Northbound had an equipment lease with Equipment Leasing Services, LLC for furnishings at its Tempe, Arizona office). The APA expressly disavowed any responsibility on Leadbot's part for Northbound's then-existing leases, including the furniture lease (APA at 7) ("[Leadbot] is not assuming any obligations or liabilities with respect to: . . . Any liability under any lease agreement between Northbound and Equipment Leasing services, LLC [sic]").

The APA did not transfer any property rights in the leased furniture to Leadbot. Although it appears that Northbound *now* owns the furniture, after failing to remit its rental payments and then negotiating with the bank to relinquish its lien on the furniture, Leadbot has not offered any evidence that it obtained any ownership interest in the furniture that Northbound leased – but did not own – at the time of the sale. Consequently, Leadbot has not carried its

burden on the conversion claim, and we grant summary judgment to Northbound, Mr. Wagner, and Mr. McAleer on this count of the counterclaim.

## 2.

In Count II of the counterclaim, Norvax and Leadbot assert a breach of fiduciary duty claim against Mr. Wagner and Mr. McAleer (doc. # 56: 3d Party Cmplt. at ¶¶ 44-62). Leadbot is a Delaware limited liability company and, therefore, Delaware law governs the fiduciary duty claim asserted here.[16] Under Delaware law, the elements of a claim for breach of fiduciary duty include (i) the existence of a fiduciary duty and (ii) a breach of that duty. *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Research*, 11 A.3d 749 (Del. 2010). Although it is undisputed that beginning in April 2009, Leadbot employed Mr. Wagner and Mr. McAleer as "Vice President of Business Development" and "Vice President of Lead Programs," respectively (doc. # 63: Answer to 3d Party Cmplt. at ¶¶ 26-27), "Delaware common law does not impose fiduciary and other related duties to members of LLCs who are neither managers or controlling members." *In re S. Canaan Cellular Invs., LLC*, 427 B.R. 85, 102-03 (Bankr. E.D. Pa. 2010); *Kuroda v. SPJS Holdings, LLC*, No. 4030-CC, 2010 WL 925853, at *7 n.28 (Del. Ch. Mar. 16, 2010).

Leadbot and Norvax allege that Mr. Wagner and Mr. McAleer were officers of Leadbot and consequently owed fiduciary duties to Leadbot and to its sole member, Norvax (doc. # 56:

---

[16]Leadbot and Norvax rely on Illinois law for their breach of fiduciary duty claim (doc. # 132 at 11-12). However, they do not explain why they conclude that Illinois law applies. In contrast, Northbound relies upon Delaware law because Leadbot is a Delaware limited liability company (doc. # 149 at 9). Under Illinois choice of law principles, which govern this case because it was filed in Illinois, a suit for breach of fiduciary duty is governed by the law of the state of incorporation. *See CDX Liquidating Trust v. Venrock Assoc.*, 640 F.3d 209, 212 (7th Cir. 2011) (citing *Newell Co. v. Petersen*, 758 N.E.2d 903, 923–24 (Ill. App. Ct. 2001)). "This is what is known as the 'internal affairs' doctrine—'a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.'" *CDX Liquidating Trust*, 640 F.3d at 212 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

3d Party Complt. at ¶¶ 45-47). Delaware law gives parties broad latitude as to the structure of an LLC and the duties of its members through the contractual provisions of their LLC agreement. *See* 6 Del. C. § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."). The Delaware LLC Act provides that the fiduciary duties of a member, manager, or other person that is a party to or bound by a limited liability company agreement "may be expanded or restricted or eliminated by provisions in the limited liability company agreement." *Id.* at § 18-1101(c). Accordingly, "to decide fiduciary duty claims in the LLC context, the Court must closely examine and interpret the LLC's governing instrument to determine the parameters of the fiduciary relationship." *Zimmerman v. Crothall*, 62 A.3d 676, 701 (Del. Ch. 2013).

Leadbot and Norvax, however, have not supplied a copy of Leadbot's operating agreement, so we are unable to discern what duties might obtain under the agreement. *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members"); s*ee also Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149 (Del. Ch. 2006) (in the context of an LLC, "it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity"). At summary judgment, the nonmoving party is required to "marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman*, 621 F.3d at 654. Here Leadbot and Norvax have not supplied this critical information.

In the absence of a contrary provision in the LLC agreement, LLC managers and members owe traditional fiduciary duties of loyalty and care to each other and to the company.

33

*See, e.g., Zimmerman*, 62 A.3d at 702 n.145 (but noting that the Delaware Supreme Court has not yet definitively determined the default fiduciary duty issue). Delaware law defines "manager" under the LLC Act to mean: "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed." 6 Del. C. § 18-101(10). It is undisputed that Norvax is the sole "member" of Leadbot, and Norvax and Leadbot have offered nothing that suggests that Mr. Wagner and Mr. McAleer were "managers" of Leadbot. Leadbot and Norvax have only asserted, at most, that Mr. Wagner and Mr. McAleer were officers and employees of Leadbot. Thus, Leadbot and Norvax have not mustered evidence that would raise a triable issue regarding whether Mr. Wagner and Mr. McAleer owed a fiduciary duty to them.

Consequently, we grant the motion of Mr. Wagner and Mr. McAleer for summary judgment on breach of fiduciary duty (Count II of the Counterclaim/Third-Party Complaint).

**3.**

Northbound, Mr. Wagner, and Mr. McAleer have moved for summary judgment on Count III of the counterclaim, the fraud claim (doc. # 112 at 3; doc. # 113 at 9-13). In the counterclaim, Leadbot and Norvax allege that Northbound, Mr. Wagner, and Mr. McAleer provided knowingly false information regarding Northbound's customer relationships and their life insurance lead purchases to Leadbot and Norvax in order to induce them to enter into the APA (doc. # 56: 3d Party Cmplt. at ¶¶ 63-71). Essentially, Leadbot and Norvax contend that Mr. Wagner and Mr. McAleer represented that they had customers who were "willing to purchase thousands of life insurance leads per month," even though they knew that they were pitching these customers a type of insurance lead that Norvax did not provide and did not want to provide

because of the high cost of generating those types of leads (doc. # 142: Defendants' Local Rule 56.1(b)(3)(C) Statement of Additional Uncontested Facts at ¶¶ 17-19, 28-29).

As we observed before, to prevail on a fraud claim under Illinois law,[17] a party must prove the following elements by clear and convincing evidence: "(1) a false statement of a material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Aasonn, LLC*, 961 N.E.2d at 951. Here, the counterclaim fraud count fails to create a triable issue for a number of reasons.

*First*, promissory fraud – a false statement of intent regarding future conduct rather than present or past facts – "is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud." *Ass'n Benefit Servs.*, 493 F.3d at 853. Norvax and Leadbot have not alleged, much less offered evidence to show, a scheme by Northbound, Mr. Wagner, and Mr. McAleer to defraud them. The vague "representations" Norvax and Leadbot allege are at best, overly-hopeful projections about future sales, and at worst, misunderstandings about mutual expectations – nowhere near actionably fraudulent misrepresentations.

*Second*, Norvax and Leadbot have failed to identify with sufficient specificity or clarity the misrepresentations upon which they relied to their detriment. *Cf. AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (discussing Fed. R. Civ. P. 9(b) requirements for pleading fraud with particularity: "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud").

---

[17]Again, because no party raises a choice of law issue on this claim, we apply the Illinois law. *See Ball*, 723 F.3d at 821.

*Third*, Norvax and Leadbot have produced no evidence that Northbound, Mr. Wagner, and Mr. McAleer did not intend to fulfill their promise to supply willing customers at the time they entered into the APA. Indeed, Norvax and Leadbot have not suggested why counter-defendants would have had a motive not to supply customers, when the counter-defendants did not receive any money up front under the APA and would only maximize their earn-out if they delivered the business. Illinois law does not "allow the plaintiffs to proceed on a fraud claim when the evidence of intent to defraud consists of nothing more than unfulfilled promises and allegations made in hindsight." *Ass'n Benefit Servs.,* 493 F.3d at 853; *see also Bower v. Jones,* 978 F.2d 1004, 1012 (7th Cir. 1992) (holding that proof that a promise was not kept "alone is insufficient to make out a claim of promissory fraud, since there is no proof that the defendants made the promise never intending to keep it").

*Fourth*, Norvax and Leadbot have offered no evidence that they were damaged in any way by the unspecified "representations" about Northbound's client relationships. They have supplied no evidence of damages, let alone clear and convincing evidence of how they allegedly were harmed.

Consequently, we grant summary judgment to Northbound, Mr. Wagner, and Mr. McAleer on Norvax and Leadbot's fraud claim (Count III of the counterclaim).

## CONCLUSION

For all of the foregoing reasons, we grant defendants' motion for summary judgment on Count I of the amended complaint for fraud. On Northbound's breach of contract claim (Count III), we grant Northbound's motion for partial summary judgment to the extent that we find liability for the withheld EBITA earn-out payments, but deny attorneys' fees, costs, and punitive damages. With regard to the defendants' motion for summary judgment, we grant defendant

36

Norvax's motion on the contract claim (Count III), and grant defendant Leadbot's motion regarding the contract claim (other than Northbound's claim for the withheld earn-out payments). Finally, we grant the summary judgment motion of plaintiff Northbound and third-party defendants Mr. Wagner and Mr. McAleer on all three of the defendants'/counter-plaintiffs' counterclaims.

With this ruling, all that remains for resolution in this case is the amount of the earn-out payments due to Northbound under the APA from August 2011 through June 2012 that Leadbot withheld, and the prejudgment interest due on that amount.[18] We set the matter for a status on December 18, 2013 at 9:00 a.m. Prior to that time, the parties shall meet and confer to attempt to reach a stipulation on the amount of damages and prejudgment interest. Absent a stipulation, on December 18, the Court will set a date for a prove up on damages.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: December 3, 2013**

---

[18]*See Oldenburg v. Hagemann*, 565 N.E.2d 1021, 1029 (Ill. App. Ct. 1991) (plaintiffs may be entitled to prejudgment interest for contractual damages if the amount due was "subject to easy computation").